**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRENT VREELAND,<br><br>Defendant. | ) | Criminal Action No. 25-CR-10290-AK |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS**

**ANGEL KELLEY, D.J.**

Defendant Brent Vreeland ("Vreeland") is charged with transportation, receipt, and possession of child pornography. Before the Court is Vreeland's Motions to Suppress (1) his statements to Homeland Security agents after he invoked his Miranda rights and (2) the search of his electronic devices. [Dkts. 66; 67]. For the following reasons, Defendant Vreeland's Motion to Suppress his statements [Dkt. 67] is **GRANTED** and his Motion to Suppress the search of his electronic devices [Dkt. 66] is **DENIED**.

## I. BACKGROUND

The following uncontested facts are taken from the parties' papers and attached exhibits. Defendant Vreeland arrived from Iceland to Boston Logan International Airport, on October 11, 2021. Upon arrival, Vreeland was referred to secondary screening because he was a match to a TECS hit[1] for possible possession of Child Sexual Abuse Material ("CSAM"). In secondary

[1] TECS is the system used by the United States Customs and Border Protection ("CBP") at the border to assist with screening and determining the admissibility of arriving individuals. An

inspection, Vreeland was confirmed as a match to the TECS hit, and his smart watch and two cell phones[2] were taken from him. [Dkt. 68-1]. Vreeland provided the passwords to his cell phones and was informed that they would be searched. CBP agents turned off the cellular and data connections for Vreeland's devices and placed them in airplane mode. CBP agents then searched the phones and found what appeared to be CSAM.

Following the searches of Vreeland's devices, CBP contacted Homeland Security Investigations ("HSI") agents and HSI Special Agents Brian Smith and Cassandra Steidle responded to the airport. Upon arrival at Logan Airport, Agents Smith and Steidle conducted a basic examination of Vreeland's phones, with cellular and data connections turned off. The agents then entered the room where Vreeland was waiting. Agent Smith read Vreeland his Miranda rights and provided him with a written statement of rights, which he signed. [Dkt. 68-3]. Agent Smith started the interrogation by discussing general topics with Vreeland, including his travel plans, work, and activities he does for fun. When the conversation turned to Vreeland's internet usage, Agent Smith informed Vreeland that the agents had searched his devices and questioned him about explicit photos that they found on his phones. Agent Smith was asking Vreeland about his deleted Discord account, when the interrogation went as follows:

---

individual from the National Targeting Center was also looking for Vreeland for suspected possession of child pornography. The National Targeting Center is a division of CBP that gathers intelligence and monitors threats to the country's security.

[2] Vreeland sought suppression of evidence from the search of his two cell phones and his smart watch. In its papers, the Government did not address the search of Vreeland's smartwatch. In an August 24, 2026 hearing on the matter, the Government represented that no pertinent evidence was found on Vreeland's smartwatch. Accordingly, the Court will only address suppression of evidence discovered on the cell phones.

- 15:56:[3] Smith - "They deleted it? And with no explanation, nothing?"
- 15:57: Vreeland - "It doesn't give you an explanation."
- 15:59: Smith - "huh. That's weird, ok."
- 16:01: Vreeland - "So, I, now I know its in trouble, so I would like to call a lawyer. Because I know what's going on. Because I'm not leaving today or tonight, am I?"
- 16:12: Steidle - "So, I just want to kinda cut in. So, I know you said that you want a lawyer. That is your choice. That is totally fine but we already, obviously, we have examined the devices. So, we wanna hear from you. Like, I'm watching you talk right now and you seem like a good guy. You seem like you are like 'I didn't even know that was in my phone' and so that's what Bryan [Smith] wants to do. We want to hear your side of the story."
- 16:31: Vreeland - "All I want to know is, I will delete telegram in front of you guys. Never open it again. I just want to go and forget this happened."
- 16:43: Steidle - "So, so here is the deal. Obviously, you said you want a lawyer, right, and so we can't really talk to you anymore."
- 16:49: Vreeland - "Ok I'll backtrack that. I just, all I want to do is get rid of the telegram account, prove to you I will never go on it again, and just walk away."
- 17:00: Smith - "So, I just wanna, to not to cut of Casandra [Steidle] and all, you're backtracking your statement? You want to continue on with the interview—"
- 17:07: Vreeland - "I select so—"
- 17:08: Smith - "Ok, without speaking to a lawyer, you select—"
- 17:10: Vreeland - "Yeah—"
- 17:12: Smith - "Okay, Great. And that's fine. Ok. So, telegram. When, do you remember the last time you were on telegram?"

The interrogation continued for approximately thirty more minutes during which Vreeland made several incriminating statements. Following the conclusion of the interrogation, Vreeland's devices were seized for further investigation, but Vreeland was permitted to leave the airport and return home. Approximately six months later, on April 23, 2025, HSI arrested Vreeland on a complaint charging transportation of child pornography. [Dkt. 2, 8]. On July 10, 2025, Vreeland was indicted on three charges: transportation of child pornography in violation of

[3] The following dialog contains exact quotes taken from a recording of Vreeland's initial interrogation by Agents Smith and Steidle. [Dkt. 68-5]. All additions are noted in brackets. Em-dashes are used to indicate where the parties are speaking over one another.

18 U.S.C. §§ 2252A(a)(1) and (b)(1), receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). [Dkt. 15].

## II. DISCUSSION

From these facts come two Motions to Suppress. [Dkts. 66; 67]. First, Vreeland alleges that Agents Smith and Steidle did not respect his request for an attorney in violation of his rights under Miranda and Edwards. Second, Vreeland alleges that the warrantless search of his cell phones violates the Fourth Amendment. The Government opposes both motions. The Court starts by addressing the searches of Vreeland's devices.

### A. The Search of Vreeland's Devices

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Searches conducted without a warrant are "per se unreasonable [under the Fourth Amendment] subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). If a warrantless search does not fall within an exception, evidence seized during that search may not be used against the defendant, see Wong Sun v. United States, 371 U.S. 471, 488 (1963), and is instead suppressed "to deter future Fourth Amendment violations[,]" Davis v. United States, 564 U.S. 229, 236-37 (2011).

One exception to the warrant requirement is for border searches. See Boyd v. United States, 116 U.S. 616, 623 (1886); Carroll v. United States, 267 U.S. 132, 149-52 (1925). This exception is grounded in the Government's "inherent authority to protect," and "paramount interest in protecting, its territorial integrity." United States v. Flores-Montano, 541 U.S. 149, 153 (2004). Individuals also have a lessened expectation of privacy at the border, such that "the

Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." United States v. Montoya de Hernandez, 473 U.S. 531, 539-40 (1985).

Searches of electronic devices at the border fall within the border search exception, and, therefore, "neither a warrant nor probable cause is required for a border search of electronic devices." Alasaad v. Mayorkas, 988 F.3d 8, 18 (1st Cir. 2021). However, the Government's ability to search electronic devices at the border is not unbounded. Although "routine" searches at the border can be conducted without reasonable suspicion, certain "non-routine" searches must be grounded on reasonable suspicion. See United States v. Molina-Gómez, 781 F.3d 13, 19 (1st Cir. 2015). "Whether a border search is routine or non-routine depends on an assessment of the facts of the case." Alasaad, 988 F.3d at 18. The First Circuit has held that "basic border searches" conducted according to CBP's internal policies "are routine searches and need not be supported by reasonable suspicion. Id. at 18-19. Basic border searches are those which require a federal officer "to manually traverse the contents of the traveler's electronic device" and "only allows searches of data resident on the device." Id. at 18.

This is precisely the type of routine search conducted on Vreeland's electronic devices. CBP and HSI turned the phones onto airplane mode and disconnected data and cellular capabilities. The agents then looked at the contents stored on the devices. These are "basic border searches" and therefore do not require reasonable suspicion or a warrant. Id. at 18-19. Accordingly, the Government can rely upon evidence obtained from the searches of Vreeland's electronic devices.

### B. Vreeland's Statements to the HSI Agents

The Court next turns to the matter of Vreeland's statements to HSI agents after invoking his right to an attorney. It is common knowledge that "a person questioned by law enforcement

officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first" be given Miranda warnings. Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Nonetheless, a criminal suspect may "knowingly and intelligently waive[] his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 444. These rules respect a suspect's preferred method of interacting with the Government while protecting "against the extraordinary danger of compelled self-incrimination that is inherent in such situations." United States v. Melendez, 228 F.3d 19, 22 (1st Cir. 2000).

As a further safeguard, in Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court established that "[o]nce a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him.'" McNeil v. Wisconsin, 501 U.S. 171, 176-77 (1991) (quoting Edwards, 451 U.S. at 484-85). If government agents "subsequently initiate an encounter in the absence of counsel . . . the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." McNeil, 501 U.S. at 177. Under this "bright line rule," "*all* questioning must cease after an accused requests counsel." Smith v. Illinois, 469 U.S. 91, 98 (1984). This rule aims to eliminate situations in which "the authorities through 'badgering' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself not withstanding his earlier request for counsel's assistance." Id.

In this case, the parties agree that Vreeland was in custodial interrogation, received his Miranda rights, and invoked his right to counsel by stating "I would like to call a lawyer." The

parties disagree about the meaning of Vreeland's next statement: "Because I'm not leaving today or tonight, am I?" The Government argues that Vreeland's question initiated further conversation. However, the recording of Vreeland's interrogation tells a different story. Vreeland says "am I?" in a dejected tone, which was notably quieter than his other statements. The question, "am I?" also follows a statement explaining why he requested an attorney. Looking at the totality of the circumstances, Vreeland's question is rhetorical, not an invitation to continue questioning. It was not reasonable to interpret this as expressing a desire to initiate further conversation, and the agents clearly did not understand it as such, because they did not answer the question, as they do later in the interrogation.

Rather than halting all questioning, Agent Steidle responded to Vreeland by reminding him that the agents already searched his devices, telling him repeatedly that they "wanna hear from [him]" and "hear [his] side of the story," telling him that he "seem[s] like a good guy," and implying that they believe he has some plausible deniability. Taken together, Agent's Steidle's statements are the type of "'overreaching'—explicit or subtle, deliberate or unintentional" that aims to "wear down the accused and persuade him to incriminate himself." Smith, 469 U.S. at 98. Accordingly, Vreeland's statements after he invoked his right to counsel must be suppressed.

The Government points to three cases to argue that Vreeland re-initiated conversation after invoking his right to counsel. First, in United States v. Conley, incriminating statements were not suppressed, because the defendant initiated further conversation by "repeatedly asking 'what's this all about?'" 156 F.3d 78, 83 (1st Cir. 1998). Second, in United States v. Fontana, the defendant asked a police officer questions about his case, then, after being read his Miranda rights, the defendant asked "[w]hat's going to happen to me?" 948 F.2d 796, 806 (1st Cir. 1991). The First Circuit held that "while ambiguous," under the circumstances, the defendant's question

"evinced a willingness and a desire for a generalized discussion about the investigation." Id. Finally, in United States v. Carpentino, the defendant initiated conversation by "waving at the camera in his cell," "confirm[ing] that he wanted to speak to [the troopers]," and asking "[h]ow much, would, uhm, the maximum time be for something like this?" 948 F.3d 10, 22 (1st Cir. 2020). In contrast, Vreeland did not ask the agents repeated questions about his case. Nor did he clearly indicate a desire to speak with the agents. Rather, Vreeland explicitly invoked his right to counsel and asked a rhetorical question when he realized he was in trouble. This does not constitute a valid waiver of his rights.

The Government further argues that Edwards has not been violated because Agent Steidle's statements immediately following Vreeland's invocation did not constitute an interrogation. The Government does not contest that Vreeland was eventually interrogated after invoking his right to counsel. Rather, it argues that Vreeland's rights were respected because Agent Steidle did not immediately start to question Vreeland. However, the Edwards protections are not as anemic as the government would have the Court believe.

The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Montejo v. Louisiana, 556 U.S. 778, 787 (2009) (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)). For this reason, courts find Edwards violations if the agents' statements pressuring the defendant to continue speaking without an attorney present "are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Cf. Brewer v. Williams, 430 U.S. 387, 399 (1977) (Christian burial speech was "deliberately and designedly set out to elicit information from [the defendant] just as surely as and perhaps more effectively than if he had formally interrogated him."). This holds true even where the pressure to speak is subtle and supposedly in

the suspects' best interest. See United States v. Churchill, 579 F. Supp. 3d 207, 213 (D. Me. 2022) (granting motion to suppress where officer responded to defendant's invocation of his right to counsel by stating "[y]ou can ask for a lawyer. It's not practical. They're not going to be able to get here today, right? But we can stop until you get an attorney. That is one of your rights."); United States v. DeLaurentiis, 629 F. Supp. 2d 68, 73 (D. Me. 2009) (suppression warranted where officers immediate response was "you do not want your attorney here").

Here, Agent Steidle's immediate response was to coax Vreeland to continue speaking. By telling Vreeland that he "seem[s] like a good guy" and that the agents "want to hear [his] side of the story," she convinced him that the agents were on his side and that speaking with him was in his best interest. Although Agent Steidle did not question Vreeland, her comments were reasonably likely to evoke an incriminating response from Vreeland. The agents did not "scrupulously honor[]" Vreeland's right to have counsel present at his interrogation. Miranda, 384 U.S. at 479. Accordingly, Vreeland's later waiver of his right to an attorney was unlawfully obtained and his following statements must be suppressed.

## III. CONCLUSION

For the foregoing reasons Defendant Vreeland's Motion to Suppress his statements [Dkt. 67] is **GRANTED** and his Motion to Suppress the search of his electronic devices [Dkt. 66] is **DENIED**.

**SO ORDERED.**

Dated: September 25, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge